Again, I'd like to thank the court for giving Susan Lunn the opportunity for this presentation. In terms of the, I should begin on this, is that I did not represent Ms. Lunn at the administrative level. She was not represented by an attorney. It doesn't, it's not really significant. It's just that the case was pursued as it was pursued outside of my choices here. Susan Lunn presented an application for Social Security disability benefits. The judge did find that she had severe spondylosis cervical. She, throughout the course of the time, has a C5 to C7 cervical fusion, discectomy and fusion. She also, in the course of our disability period, suffers from, and the ALJ found, she suffered from bilateral carpal tunnel symptoms, subsequently bilateral carpal tunnel surgery, and finally bilateral plantar fasciitis, for which she ultimately underwent bilateral heel surgeries. The issues that bring us here to the court... Basically, during the period, she had three different surgeries. Is that right? I think she had five surgeries. She had a cervical surgery. She had both carpal tunnel surgeries. There's records of one heel surgery. There's a reference in one of the doctor's records that she had five surgeries. That was the basis for Dr. Reed's assessment. In the form he fills out, one of the basis for that is five surgeries. What brings us here today are, I think, three issues that are ignored in terms of time frames. My presentation in the brief, I have to apologize for. I don't know if there's a better way to do it. I tried to organize the facts by complaints, not just a chronological list, but I tried to organize the statement of facts by presentation. But, for purposes today, the records for headaches, which are ignored by the ALJ or found that they're severe, headaches from May of 2003 through January 24th of 2005, we're dealing with a 24-month period of requirement for disability, at least to be awarded a year's period of benefits. So there's over a year and a half for headaches. Records on depression, the second issue that is minimized by the November of 2003 through October of 2004, she suffered from severe depression, severe enough that the global assessment of functioning was at 50 and 49, both of which meet Social Security's definition of severe, as well as the mental health experts' definition of what is interfering with activities of daily living. Finally, the plantar fasciitis, she suffers from March of 2003 through April of 2005, ultimately having surgery. So there's three separate issues, all of which have at least a 12-month window in the course of the date she alleges disability through the date of the hearing. Now, the judge ignores headaches, ignores her testimony that she has migraines a couple of times a month, and says that there are, there's only one presentation of headache after February of 2004. If we review the record, and that's counsel's argument at page 38 of his brief, if we review the record, from May of 2003, Dr. Wilson has Susan Lunn on medication, Zoloft on medication, and she's been on medication Zoloft, she has, he diagnoses chronic tension headaches, maybe this is why we're here, because then he uses the following words, occasionally these become severe, however, those are modest. And I don't know how to present what that means, because severe is obviously not modest. The only way I can say that that makes sense is modest refers to the number of times she has them, which she represents as a couple of times a month. It begins with that she treats and is treated with Zoloft, they add Imitrex for migraines, later they go through, and she later is treated with Tylenol 3, she gets a headache, but she has chronic headaches. Didn't she describe the headaches as relatively modest? No, she doesn't. She says they're occasionally severe. She has two types of headaches. She has headaches that she deals with on a daily basis, and if she treats those, then she's going to, if she can get them treated in time, hopefully she stops them from going into migraines. She has occasional severe headaches. The wording that, and maybe it's why we're here, is because the doctor, when he talks about that, at least in May of 03, says they're occasionally severe, and immediately after that says, but they're relatively modest. That's why my argument is to make that sentence make sense, modest has to refer to the number of times she's having them, which she says is occasionally, a couple of times a month. She treats throughout 04, Reid adds Neurontin for relief of the headaches. She continues on Imitrex, she's using Zoloft and Tylenol 3. There's reference to headaches. Eventually she's going to have a surgical, cervical surgery in October of 04. Even after surgery, she continues to suffer from headaches. She continues to suffer from spasms. The records show that she reported in November of 04, she had headaches. She had good and bad days, and there's no dispute on that. She had good days. She reports, as of January 05, she's given muscle relaxants. This is after the cervical surgery. So the doctor still determined that she's suffering from cervical muscle spasms, or trapezius, and he's prescribing muscle relaxants. And it's all again to keep the headaches from becoming migraines, from increasing, if they can medicate them beforehand. But she still is giving Imitrex. What was the Zoloft prescribed for? It was being used for sleep relief, I think depression, and I don't know if it's off-brand use for headaches. I won't say. But at some point she stopped refilling that prescription. She ran into financial problems. She eventually testified she's on food stamps, $400 a month. She does not have the money to continue. Throughout the course of, what have we got, 33 months of treatment in here, she's got 42 doctor's visits. And so she runs out of money. So it's not a function of not need. There's a function of just financially she can no longer continue. The last treatment we have, January 24, 05, is the one where Dr. Mack, the neurologist, says she's got migraine, she will get a migraine if she doesn't treat the headaches aggressively. And at that time, she's on muscle relaxants. The cervical fusion occurs in October of 04. That was Dr. Mack did the surgery. She follows up. Even after the surgery, she continues to report arm and shoulder pain. We don't know if that's related to muscle spasms. There's no specific finding on whether that's related. In terms of depression, which is the other, that's the PDR reason for Zoloft, she treats with major depression beginning September of 2003. She starts off indicating she's had it for about a year. But as of that date, the gap is 50, global assessment of functioning. And that's showing she's got significant problems with the depression. She continued. I thought there were medical records that said it was controlled by Zoloft and she was okay after that. She wasn't okay. It was controlled by the Zoloft and it was improved. I don't think it's okay. I think it's a similar problem in terms of the ALJ finding to the court's decision in Ryan in July of 08. This court described that improving is not something you can use to say there's no longer a problem. You need some kind of, improving doesn't mean there's no longer a problem because when you look through the records, she continues to October 27th of 04 with Dr. Sampson. At that time, she's got a gap of 49. So at a minimum, we should be looking at why didn't the judge give her that 12-month period of time because clearly she's got a 50 and a 49 throughout that period of time. And so there's no explanation for why that isn't addressed in terms of a severe finding. I wonder that in general about the record here, about whether it would be more useful to look at it in discrete chunks because there were obviously periods of time when she was both depressed but also having these surgeries and before the surgery. So looking at it in the aggregate gives us in some ways less useful than looking at it in chunks. Do you have a chunk that we should look at? Well, and that's why I say I had organized my presentation of statement of facts in terms of time frames. I think the headaches relate from May of 03 through January 24th, 05. That's the last medical record we have. If I can finish, the depression relates to September of 2003 through October 27th, 2004. Start with a gap of 15, end with 49. And finally, the plantar fasciitis, which alone, if it was the argument, I don't think I'm successful. But in combination with the other ones, she treats with that from 03-24-03 and ultimately a surgery for 07 of 05. I'm out of time. Thank you. Thank you. Mr. Berger. May it please the court. Again, this is a case where a claimant looks at step two, but really it's a step four issue. Credibility permeates throughout this. You have a claimant who was able to take care of herself, tend to animals, not just animals. She has a veritable family of horses. She has peacocks that she's taking care of. She cooks. She does laundry. She shops. She drives a manual transmission car. She cares for her children, including a four-year-old. And she was able to ride horses. Indeed, right after her carpal tunnel syndrome, she went into the doctor and said, can I ride horses? Very soon after the carpal tunnel syndrome, and the doctor said, sure, but just make sure the horse isn't green because he didn't want her to have an untrained horse. So she was doing a lot of stuff. Yet, despite the fact that she was doing a lot of stuff, when she read a disability report on page 79 of the transcript, she said she spent most of her time sleeping and staring into space. Again, aren't there different time frames here? I mean, that's part of the problem. We're dealing with a three-year period, and my sort of impression is that both the things you said were true. They were true for some period of time that she was quite depressed and inactive, and for large periods of time that she wasn't. Your Honor, that may be true, but that's not what plaintiff claimed, and that's not what she brought up through the ALJ. She said to the ALJ, I have all of these problems throughout the time, and that's the way the ALJ looked at it. That's what I'm wondering about. I mean, what is her responsibility to, if there are subperiods, how is that usually adjudicated? I'm not sure exactly how an ALJ would approach it. One way to approach it would be to look at periods of 12 months and say that we have a closed period or we don't have a closed period, but that raises a whole lot of problems for the ALJ to consider. He has to look at the whole thing, and if he finds that she's disabled during one period, he's going to have to do a CDR, a continuing disability review analysis, to determine if she actually got better, and it switches a burden. So it's a very difficult thing for the ALJ to think about doing. Does the ALJ know at all about whose responsibility it is to figure that out and how and so on? In other words, did she have to come in, did she have some responsibility to come in and say that I was disabled for some subset of period, and she doesn't say that the ALJ has no responsibility to break it down, or what? Your Honor, I think the real line should be drawn between pro se claimants and claimants who are represented, and she was represented. So she wasn't her? She was not represented by an attorney, I believe. I believe she was represented by a non-attorney, but she didn't come in on her own. And in this particular case, although she claims that she has depression, she had the mental faculty to think, and if she says it was really bad during a 15, 16-month period, I would think that the ALJ would have an obligation to say, let's look at the individual period. I would also say if it's apparent in the record that somebody has an impairment that only lasts 14 or 15 months, then the ALJ would have a duty to go in and say it. But that doesn't absolve the claimant of all duties at the hearing. If the claimant or the claimant's representative believes that, then the claimant should bring it up. But I think if the commissioner was asked what the policy was, the policy would be that the ALJ should recognize it. So, again, this goes to the credibility assessment. She claims that she has headaches, and then she says the ALJ ignored her headaches. But the court looks at transcript page 17, there's a paragraph on the headaches. She claims that the ALJ ignored her depression. But if you look on page 16 and 17 of the transcript, the ALJ talked about her depression. He found that she had these medically determinable impairments. And he found other medically determinable impairments that were severe. So that's all he had to do at step two. It goes on to step four, where he has to consider all the limitations, severe and not severe. Now if the ALJ truly didn't think that depression was a medically determinable impairment and he ignored it, he would not have found the RSC they did. He found she had the RSC to perform complex tasks, yes. But if you look at the actual RSC that the ALJ found, he talks about clerical tasks, multi-step tasks, and following complex instructions. And that's what she was able to do. And the reason he got that is he looked at the vocational assessment that she did. And again, she complains, the plaintiff complains that the commissioner's brief said she could perform complex tasks and it's nowhere in the record, but it is. If you look at the, if the court looks at the medical record and talks about learning an eight-step procedure in the vocational assessment, and that is a complex task. So if you look at the record, she has depression, and maybe it causes some limitations, maybe not. We don't know what limitations it caused, but she went to the vocational assessment and was able to learn the eight-step procedure that they gave her. That indicates that the depression was not as severe as she alleged. Also, you look at the headaches that she alleges that she has, and you would think if she has the headaches as bad as she does, she's not going to be able to do that. And back a minute. I don't understand what you said about the mental evaluation and depression. The vocational evaluation and depression. She was able to do what? She was able to? She was able to learn an eight-step procedure. What does it have to do with whether she was depressed? The question for the ALJ is how does a depression affect her ability to perform work activities? And one of her allegations is that the depression causes her not to be able to concentrate and be able to perform a lot of complex jobs. So being able to perform the eight-step procedure is a complex job that she could perform, and it shows that her depression is not as bad as she alleged, or the limitations from the depression are not as severe as she alleged. If you look at the state agency psychologists, especially the one at 148 and 149 of the transcript, you see that the commissioner did find that she had a pretty bad depression for a little period of time, and that addresses your concern, Judge Berzon, but it lasted for less than 12 months, which is considered a non-severe impairment. And that is what is exactly found on page 148, where the state agency medical experts found the impairment was severe but not expected to last for more than 12 months. So they did consider a time frame for it. Ms. Long has a lot of daily activities. She's doing a lot of things. The ALJ looked at that and assessed her credibility based upon what she could do and how often she did it, and he looked at that, her statements, including the statement on page 79 where she said she spent most of her time sleeping and staring into space, and that's simply inconsistent with the daily activities that she claimed that she had. And he assessed the credibility, found that she could perform a really restricted range of work, and then relied on vocational experts' testimony that with the restricted range of work that the ALJ found, she could actually perform a significant number of jobs in the national economy. The ALJ found that she was therefore not disabled, and the commissioner asked the court to find that that finding was supported by substantial evidence and free of legal error. Thank you, Mr. Berger. Thank you. Mr. Southers, do you want a minute in rebuttal? I would appreciate that. Thank you. In terms of answering some of the questions brought up to counsel, if there's going to be a test and say that the claimant's got to present something and then the ALJ has to weigh it, that's the rules that exist now. I mean, the rules are the claimant's got to present what her problems are, his problems are, and then the ALJ has to assess those. The record in terms of her condition that she presented to the ALJ shows she discussed the condition of her heel and some progression from that excerpt 270-271. The pain and numbness before and the occasional problems after carpal tunnel surgery are 273-274. Headaches and how those affect her over time, 274-276. Her hands at 276 before and after the surgeries and her depression, I didn't get the page number for that. I think what the vocational expert testimony, the counsel referred to, if you rely upon the treating physician's assessment at page 306, the vocational expert says she cannot do substantial gainful activity. That's the treating physician. Thank you. Thank you both gentlemen. The case is argued and submitted. Good morning.
judges: Silverman, Berzon, Mahan